# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

MICHAEL SLAFKA, and
DAVID CARR,

|                        |                    |
|------------------------|--------------------|
| *Plaintiffs,*          | No.: 3:21-cv-217-GCM |
| *v.*                   |                    |
|                        | CIVIL COMPLAINT[1] |

THOMAS F. REECE,
PAMELA L. HARRINGTON,
THOMAS V. BENNETT,
PAUL H. VANDIVER, JR.,
LAURA MILLER,
ROBERT M. JOHNS, JR.,
ROBERT D. "DEAN" FREEMAN,
CHAN M. AHN,
PHIL HENDERSON,
KRISTEN MULLINAX,
BETHANY TOTHEROW,
G. BRUCE TURNER,
CYNTHIA JONES,
CAPITAL EXTERIORS & RENOVATIONS, LLC,
KUESTER MANAGEMENT GROUP, LLC,
WILLIAM DOUGLAS MANAGEMENT, INC.,
HENDERSON PROPERTIES, INC.,
FAIRWAY TOWNES OWNERS' ASSOCIATION, INC.,
SELLERS, AYERS, DORTCH & LYONS, P.A., and
AHN LAW FIRM, LLC,

                                               *Defendants.*

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

       Plaintiffs, MICHAEL SLAFKA, *pro se* and, DAVID CARR, *pro se*, respectfully file this Complaint for money damages.

_____

[1] Jury trial demanded.

<u>PARTIES</u>

1.      Plaintiff Michael Slafka is an honest, hard-working, bill-paying, tax-paying, law-abiding citizen and upstanding member of society with a FICO score over 800. He is the sole owner of a townhome located in the 177 unit, "Fairway Townes" townhome subdivision. At all times relevant, Mr. Slafka was a resident of the state of South Carolina.

2.      Plaintiff David Carr is Mr. Slafka's financial advisor and *first-hand* witness to the gross mismanagement of the property[2] and the Board's fiscal irresponsibility and abusive practices. Mr. Carr is a fraud expert. Mr. Carr also has extensive experience in real estate and residential building construction. Mr. Carr even successfully negotiated a siding warranty claim on behalf of the Association in 2016 after Kuester, the *then* property management company, was unable to. As such, Mr. Carr is the only resident of the community to—*single-handedly*— save the Association over $30,000.00. The Board, of course, retaliated by engaging in a smear campaign portraying Mr. Carr as a "trouble-maker." The Board then changed the Rules[3] in an effort to make sure that neither he nor Mr. Slafka would ever obtain a position on the Board. Mr. Carr is a tireless advocate for consumers—especially the elderly. Mr. Carr became a loud and outspoken critic of the Board *after* a Board member swiftly removed public delinquent tax notices placed on common areas throughout the community by the York county sheriff. At all times relevant, Mr. Carr was a resident of the state of South Carolina.[4]

---

[2] Plaintiffs allege that the Association's board of directors regularly and routinely enlist the services of a "property" management company that's really in the business of "homeowner" management. As such, emphasis is placed on policing the homeowners at the expense of sound "property" maintenance and management, to the unjust enrichment of the *so-called* property management company; benefit of the board of directors; and, to the detriment of the Association and its Members.

[3] The Rules prohibit "renters" from serving on the Board. The only two (2) requirements: applicants must be, a.) owners; and, b.) willing to make a two-year commitment. Fearing a "run" by Mr. Slafka, the Board hastily seated a "nomination committee" and—<u>without the authority to do so</u>— added a *third* requirement: "on-site." (To be clear, Mr. Slafka <u>is</u> an "on-site" homeowner but Kuester and the Board *misled* the nomination committee—*based on what information exactly, unknown, since it wasn't true*—and his nomination was, *cleverly*, barred.)

[4] The plaintiffs are not a same-sex couple. (Not that there's anything wrong with that.)

2

3.     Defendant Thomas F. Reece ("Reece") was, at all times relevant, one of the Association's board members who, despite 1-year term limits, enjoyed the position of president for an unprecedented five (5), consecutive years. Mr. Reece often bragged about being immune from prosecution. Mr. Reece liked to "rule with an iron fist." Significantly, Mr. Reece was the president of the Association in 2019 and 2020 during the entire roof special assessment controversy. Mr. Reece was also the president, a.) when the "onsite" requirement was added;[5] b.) when the Board changed the Rules, twice;[6] c.) when the Board shortened the thirty (30) day time period in which to dispute a debt under the FDCPA[7] to fifteen (15) days; and, most significantly, d.) on March 6, 2020, when the phony, January 1, 2020 "invoices" were mailed to Members of the Association. Mr. Reece is an adult individual. He is a resident of South Carolina. He was a resident of South Carolina during the events giving rise to this case.

4.     Defendant Pamela L. Harrington ("Harrington") was, at all times relevant, one of the Association's board members; significantly, a board member during the entire roof special assessment controversy. Ms. Harrington is an adult individual. She is a resident of South Carolina. She was a resident of South Carolina during the events giving rise to this case.

5.     Defendant Thomas V. Bennett ("Bennett") was, at all times relevant, one of the Association's board members in 2019, during the first half of the roof special assessment

---

[5] Even though the Board was given more than enough time to—*finally*—remove the illegitimate "on-site" requirement prior to the 2019 election, the Board, by and through Mr. Reece, issued an edict that it would be removed for the 2020 election. Not surprisingly, Mr. Reece reneged on that promise, too. (Thus, the recurrent, "Sorry, not enough time. We'll do it next year!" stage was set, provided, of course, the Board waited months—as they had in the past—to respond to a Member's legitimate objection to this prohibited provision. (They knew this game—and, they knew it well.))

[6] Twice; in 2019, alone. Changes which were recorded without disclosing those changes to the Members—or even disclosing the fact that the Board was even considering changing the Rules in the first place. Of course, it didn't hurt that Minutes were routinely kept to the bare minimum—only four (4) or five (5) sentences in length—and not published for nine (9) months. (It is the plaintiffs' understanding that the 2021 Board of Directors reversed and rescinded the previous Board's undisclosed Rules' changes.)

[7] Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*

3

controversy. Mr. Bennett is an adult individual. He is a resident of South Carolina. He was a resident of South Carolina during the events giving rise to this case.

6.      Defendant Paul H. Vandiver, Jr., ("Vandiver") was, at all times relevant, one of the Association's board members in 2019 and 2020, during the entire roof special assessment controversy. Mr. Vandiver is an adult individual. He is a resident of South Carolina. He was a resident of South Carolina during the events giving rise to this case.

7.      Defendant Laura Miller ("Miller") was, at all times relevant, one of the Association's board members in 2019, during the first half of the roof special assessment. Ms. Miller is an adult individual. She is a resident of South Carolina. She was a resident of South Carolina during the events giving rise to this case.

8.      Defendant Robert M. Johns, Jr., ("Johns") was, at all times relevant, one of the Association's board members in 2020, during the second half of the roof special assessment controversy. Mr. Johns is an adult individual. He is a resident of South Carolina. He was a resident of South Carolina during the events giving rise to this case.

9.      Defendant Robert D. "Dean" Freeman ("Freeman") was, at all times relevant, one of the Association's board members in 2020, during the second half of the roof special assessment controversy. Mr. Freeman is an adult individual. He is a resident of South Carolina. He was a resident of South Carolina during the events giving rise to this case.

10.     Defendant Chan M. Ahn ("Ahn") acted, at all times relevant, as the Board's *defacto* attorney under the guise of acting as the Association's attorney.[8] Mr. Ahn is an adult

---

[8] The Board of Directors is not a legal entity. The Board of Directors is a group of five (5) individuals. As a group of five (5) individuals, they certainly have the right to retain their own counsel but they appear to treat the Association's attorney as their own. And, it appears they do so with his consent. This is not even in dispute. The Board has referred to Mr. Ahn as "the Board's attorney" orally and in written communications with total impunity.

The Board, in fact, treats all entities as their own. They even enjoy a personal "security detail" funded by the Members of the Association—and, under contract to the Members of the Association—but who "act" only upon the "orders" of the Board.

individual who, at all times relevant, acted under the color of Law and within the scope of his employment.[9]

11.     Defendant Phil Henderson ("Henderson") is an adult individual who, at all times relevant, acted within the scope of his employment.

12.     Defendant Kristen Mullinax ("Mullinax") is an adult individual who, at all times relevant, acted within the scope of her employment.

13.     Defendant Bethany Totherow ("Totherow") is an adult individual who, at all times relevant, acted within the scope of her employment.

14.     Defendant G. Bruce Turner ("Turner") is an adult individual who, at all times relevant, acted within the scope of his employment.

15.     Defendant Cynthia Jones ("Jones") is an adult individual who, at all times relevant, acted within the scope of her employment.

16.     Defendant Capital Exteriors, LLC ("Capital") is a for-profit North Carolina corporation with its principal place of business in North Carolina.

17.     Defendant Kuester Management Group, LLC ("Kuester") is a for-profit North Carolina corporation with its principal place of business in North Carolina.

18.     Defendant William Douglas Management, Inc., ("WDI") is a for-profit North Carolina corporation with its principal place of business in North Carolina.

19.     Defendant Henderson Properties, Inc., ("HPI") is a for-profit North Carolina corporation with its principal place of business in North Carolina.

20.     Defendant Fairway Townes Owners' Association ("FTOA") is a not-for-profit South Carolina corporation with its principal place of business in South Carolina.

---

[9] Mr. Ahn's actions are alleged to have triggered the crime-fraud exception.

21.     Defendant Sellers, Ayers, Dortch and Lyons, P.A., ("SADL") is a for-profit North Carolina corporation with its principal place of business in North Carolina.

22.     Defendant Ahn Law Firm, LLC ("ALF") is a for-profit South Carolina corporation with its principal place of business in South Carolina.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

24.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1343 as the Plaintiffs' cause of action arises, in part, out of violations of: 18 U.S.C. § 1030 – the *Computer Fraud and Abuse Act (CFAA).*

25.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1343 as the Plaintiff's cause of action also arises, in part, out of violations of: 15 U.S.C. § 1692 – the *Fair Debt Collection Practices Act (FDCPA).*

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332; the amount in controversy, exclusive of interest and costs, exceeds seventy-five thousand dollars ($75,000.00).

27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332; diversity of citizenship between the plaintiffs and defendants.

28.     This Court has personal jurisdiction over the defendants due, in part, to the fact that the defendants, a.) transacted business in this District; b.) caused tortious injury by acts committed within this District; and, c.) caused tortious injury by acts committed outside this District while regularly doing business within, engaging in persistent conduct within, and deriving substantial revenue from services rendered within this District.

6

29.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this Complaint occurred in this District and because the defendants are subject to the Court's personal jurisdiction in this District.[10]

30.     Requiring the defendants to litigate these claims in this District does not offend traditional notions of fair play and substantial justice and is permitted by the Due Process Clause of the United States Constitution.[11]

## PRELIMINARY STATEMENT

31.     Homeowner Associations ("HOAs") are good.  HOAs [can] play a vital role in maintaining high property values.  Unfortunately, given the right ingredients, HOAs can also be a recipe for disaster—a source of evil, not good.  We see that here.  This is not a case where the HOA did *one* thing wrong but rather, didn't do *anything* right.  The facts in this case are stunning—replete with <u>outrageous</u> acts and totally <u>egregious</u> behavior.  There was no limit to the bullying—*under the guise of lawful Rules' enforcement*—as this not-so-subtle attempt at intimidation shows.  (And, it didn't stop here.  Slafka had two choices: capitulate—or, leave.)

---

[10] This District also served as the location—jurisdiction and venue—for a claim arising out of construction related issues on the same development—Fairway Townes—in which the Association was an intervenor.  The matter settled but not unlike the majority of homeowners, the plaintiff has no idea "who" signed off on (informed the Court that the work was completed in a workmanlike fashion and as per the terms of) the "Agreement."   Or, if it was <u>negligently</u> signed off on or, <u>fraudulently</u> signed off on.  Given the fact that roof leaks and failing "boots" made up part of the suit—but that not all roofs were inspected (or, boots replaced)—it is possible that this Court will want to reexamine settlement documents filed in the matter.  Whoever signed off on the settlement agreement—on behalf of FTOA, at least—did so, presumably, under oath.  Surely this Court is as interested as the plaintiff as to the validity of the statements made to this Court.  And, surely, the plaintiff—who has been kept in the dark all of these years—has the right to know that, too.  The plaintiff is not a conspiracy theorist.  But the Board was overly anxious to replace the shingles—shingles that were still under warranty—at a cost of almost a million dollars.

[11] Plaintiffs respectfully request this Court also consider the hardship placed on other potential witnesses—many of them elderly—if called on to testify, and the hardship it would be on them to travel to another District, further away.

7

**Exhibit "A"**



Vehicle info

Work schedule

"our subject"

Parents' address and phone number

Parents' names

Brother's name

Brother's name and phone number

Sister's full name

This document—*a page of his parents' power of attorney*—was handed to Mr. Slafka; at 6 o'clock in the morning; at his place of employment; along with a "First Notice of Rule's Violation;" by a private investigator hired to surveil him (at great and unnecessary expense to the Association as he—*unlike the Board*—had never refused certified mail); a "process server" who, only days earlier, was reminded that Mr. Carr was, in fact, Mr. Slafka's *duly* appointed power-of-attorney and who was asked to **stop** participating in this tomfoolery under the guise of the lawful service of process. (Shockingly, he even said, "*You have been served.*")

8

## FACTUAL BACKGROUND

32.     On or about May 10, 2019, FTOA, by and through its *then* Board of Directors; William – Douglas, the *then* property management company; and, person(s) unknown, provided—*anonymously and via electronic mail*—an unsigned, uncorroborated and what appeared to be, professionally prepared, two-page document entitled: "Fairway Townes Roof Special Assessment Fact Sheet" to, presumably, all of its Members.[12]

33.     On or about May 12, 2019, the plaintiffs requested, in writing, answers to a number of questions raised by the uncharacteristically anonymous e-mail; including, but not limited to, a.) the identity of the fact sheet's author; b.) the identity of the e-mail's sender; c.) a true and correct copy of the 2011, *Kimley-Horn* report cited in the Fact Sheet; d.) explanations, clarifications, reports and/or expert opinions relied upon or which served as the basis of, or, constituting facts contained therein; e.) how much of the Association's monies, if any, were used in the preparation of the document; and, finally, f.) a notarized Affidavit from each Board member stating that the information contained in the Fact Sheet was true and correct to the best of his or her knowledge.[13]

34.     On May 23, 2019, FTOA, by and through its Board of Directors and William – Douglas, convened a meeting for the express purpose of having the Members agree to the $743,400.00 project—$4,200.00 each—with only a few weeks' notice and relying—*almost entirely*—on the anonymous (and, questionably factual), two-page "Fact Sheet" and a

---

[12] The sender's email address was identified only as, "williamdouglas@cincsystems.net."

[13] Despite all five (5) *then* Board members receiving this request from a dues-paying Member of the Association—directly; and, at his or her place of residence—not a single Board member responded.

9

PowerPoint presentation given by Capital Exteriors; the contractor the Board had, for all intents and purposes, already chosen to do the work.[14, 15, 16, 17, 18, 19]

35.     Prior to the subsequent Special Assessment meeting, FTOA, by and through the *then* Board of Directors, forged ahead with the project and replaced eight (8) roofs—*in return for payment in full[20] and eight (8) "yes" votes*—despite the clear and unambiguous language barring them from doing so.[21]

---

[14] The measure failed with a quorum present.

[15] According to a spokesperson for at least one of the *Slafka* plaintiffs, the Members were led to believe that Capital Exteriors was a "certified" roofing contractor and/or, "certified" shingle installer in spite of the fact that this title and "certification" was *sales*-based and not education- or experience-based.

[16] Capital Exteriors, LLC, the company *hand-picked* by the Board, had the least experience and only *out-bid* the other, far more experienced roofing companies by "five (5) dollars a square" (although the exact number of squares and the other bids were never, officially, disclosed). An overwhelming number of homeowners, however, supported the idea of paying *more* for an experienced roofing company—one that had been in business longer—as opposed to a relatively inexperienced, *general contractor*, given the history of roofing problems in the Community. For reasons unknown, however, the issue of "who" was going to do the work, was not up for debate.

[17] Other than shingle color, the Members were, in actuality, not reviewing, considering, contemplating, approving or voting on *any* substantive issue related to the project—contrary to Section 5's intent and unambiguous language.

[18] Under normal circumstances, a Member-owned homeowner's association tasked with such a major undertaking would consider not only all of the bids but every aspect thereof, including, but not limited to, cost, manufacturer warranties, experience and workmanship guarantees. (Here, they were relegated to color.)

[19] *See also:* edict issued by the Board: "Capital Exteriors is the only contractor authorized to work on the roofs."

[20] Monies later returned.

[21] By replacing eight (8) roofs, the *then* Board, effectively, and for all intents and purposes, neutered the Members, robbing them of the benefit of the contract, specifically, Section 5 of the Covenants. This bold act effectively meant the Board was exercising unilateral control over every aspect and the entire scope of the project (even the color of the shingles); inarguably, flatly ignoring the clear and unambiguous language of Section 5 and its intent that this power rests solely in the hands of the Members and not the five (5) Board members.

36.     On September 26, 2019, FTOA, by and through the *then* Board and this time, Henderson Properties—*the new management company*—convened what they referred to as the *second* Special Assessment meeting.[22]

37.     For reasons unclear, however, no new bids were provided and no new proposals were submitted to the Members at this time.[23]

38.     Instead of presenting new bids or new proposals, FTOA, by and through the *then* Board—with Henderson observing—told the Members—*many of them elderly*—that the price had gone up by $53,100 **_and_** that it would go up by another $66,375 on January 1st—*if* the Members did not vote "yes."[24]

39.     Members—*many of them elderly*—were also told that their share—now $4,500—could *still* be spread out over ten months; but again, only if they voted "yes."[25]

40.     FTOA, by and through the *then* Board—with Henderson's assistance—then conducted a "vote" on the more expensive version of the very same proposal the Members voted on—*and rejected four months earlier*—in May of 2019.

41.     FTOA, by and through the *then* Board—with Henderson's assistance—then announced that the measure passed by two votes.[26, 27, 28]

---

[22] It is unclear why the Board referred to this as the "second" meeting since that designation is reserved for when quorum is not satisfied at the first meeting.

[23] Normally, after a proposal is rejected, the process of obtaining bids is started all over again.

[24] According to a spokesperson for at least one of the *Slafka* plaintiffs, both wholly disingenuous statements.

[25] According to a spokesperson for at least one of the *Slafka* plaintiffs, the *Slafka* plaintiffs argue, at length, that the *then* Board of Directors did not have the authority to defer billing to January of 2020. The *Slafka* plaintiffs further argue that not only did doing so violate Section 5 of the Covenants but also that the purpose of the "deferment" was to get more Members to vote "yes." Regardless of their motives, the *then* Board simply did not have the authority to do so and certainly not for the express purpose of, for all intents and purposes, affecting the vote.

[26] Including the eight (8) votes secured prior to the vote; after an unknown number of *closed-door* meetings.

[27] After confessing that counting the votes was delayed because the number of ballots cast did not match the number of Members in attendance, both in person and by proxy.

[28] No Notice of Assessment was issued.

11

42. FTOA, by and through the *then* Board—with Henderson observing—then told the Members—*many of them elderly*—that they would be "invoiced" for the $4,500, "Special Assessment" on January 1, 2020.[29]

43. On or about December 5, 2019, FTOA, by and through the *then* Board, confirmed that the "invoices" would be provided by U.S. Mail on January 1, 2020.[30]

44. On or about January 15, 2020, FTOA, by and through the Board, issued a statement that the "invoices" would be included with the *new* payment books.[31]

45. It is important to note that between the September, 2019 vote and January, 2020, FTOA, by and through the *then* Board, provided *pro forma* "invoices" to any Member requesting one for the purposes of refinancing or obtaining a HELOC (home equity line of credit) to pay the $4,500.00 assessment.[32]

46. On or about January 29, 2020, Henderson Properties, the property management company and entity responsible for *all* of the Association's finances—*including all of the billing*—sent notices to several Members stating that their accounts were *past-due* for the failure to pay, "$4,500 in late fees owed to the Association."[33, 34]

---

[29] Without citing the Covenant, Rule or Bylaw authorizing this delayed billing and while ignoring the clear and unambiguous language in Section 5 of the Covenants; which, for good reason, requires that all monies collected be allocated and disbursed during the same year and under the supervision of the same five (5) member Board.

[30] According to a spokesperson for at least one of the *Slafka* plaintiffs, Henderson was well-aware of the limitations placed on it by Section 5 of the Covenants and, for this reason, refused to generate the invoices.

[31] They were not.

[32] To be clear, Members were given a crude invoice cleverly marked "*pro forma*" that appeared to be, for lack of a better word, homemade. (By this time, the Board had added an insurance rider to the Association's insurance policy that included coverage for employee fraud.)

[33] Both, curiously and troubling, according to a spokesperson for at least one of the *Slafka* plaintiffs at least, when contacted, Henderson employees were adamant that the charge had nothing to do with the roofs, even though the amounts were identical.

[34] Signaling Henderson's knowledge of Section 5 and necessitating the $4,500 charge be "entered" as anything but the "2019, Roof Special Assessment," hence the scheme to enter it as "late fees" perhaps not even realizing that their accounting software would automatically kick out the *past-due* notices.

12

47.     On February 5, 2020 (via e-mail and again nine (9) days later via regular mail), Henderson informed the Members that, "The $4,500 roof assessment has been charged to all owners accounts."[35, 36]

48.     In response thereto, the Members requested from Henderson, and in writing, the Covenant, Rule or Bylaw that authorized the January 29th, $4,500 charge.[37, 38]

49.     On or about February 24, 2020—no response having been received from Henderson's Kristen Mullinax—the Members, <u>again</u>, disputed, in writing and directly to Henderson, the validity of the debt pursuant to the FDCPA codified at 15 U.S.C. § 1692; and, <u>again</u>, requested a copy of the Notice of Assessment from the September, 2019, roof "Special Assessment" meeting; and, <u>again</u>, requested a copy of Section 5 of the Covenants; and, <u>again</u>, requested the Covenant, Rule or Bylaw that authorized Henderson's levying the $4,500 charge for the <u>2019</u>, roof "Special Assessment" six months later, <u>in January of 2020</u>.[39]

50.     On or about March 6, 2020, FTOA, by and through the Board, mailed an "invoice" dated January 1, 2020 to all of the Members; not only sixty (60) days after it was dated—*and almost thirty (30) days after the <u>first</u> payment was, allegedly, due*—but almost one hundred, eighty (180) days after the September, 2019, roof "Special Assessment" meeting.[40]

---

[35] Inarguably, a true statement. It is important to note, however, that Henderson employees were careful not to use the words, "September", "2019" or "Special Assessment" instead referring to it only as a "roof assessment."

[36] *See*: Mullinax (Henderson Properties), "FTOA Special Assessment Letter" dated February 4, 2020.

[37] The response to which should have been immediate. If the $4,500 charge was legitimate, if Henderson and the Association were authorized to levy the charge—*if the Rules, in fact, permitted it*—then Henderson employees should have been capable of quickly and easily stating, "Section 5 of the Covenants," period, end of story. But Henderson employees were loath to use those words—*as if they were catastrophic*—and remained "mum."

[38] Written "request" for the Covenant, Rule or Bylaw; a "Cease and Desist;" <u>plus</u>, official "Dispute of Debt" pursuant to the FDCPA codified at 15 U.S.C. § 1692, *et seq*; <u>to which no response was received</u>.

[39] No response was received.

[40] There were other oddities associated with the mailing. First and foremost, it was <u>not</u> from Henderson Properties, the entity responsible for <u>all</u> of the Association's billings. The envelope contained no return address. No name appeared on the envelope or on the invoice, inside. And, the "Customer ID" number that appeared on the invoice did not match the Member's five-digit account number—the account number provided by Henderson Properties. <u>It was a fraud</u>.

51.     On or about March 9, 2020, the Members notified Henderson's Kristen Mullinax of the "suspicious" invoice, in writing; and, again disputed the debt pursuant to the FDCPA codified at 15 U.S.C. § 1692.[41]

52.     On or about April 29, 2020—*as if the debt had never been timely and/or, properly disputed multiple times*—FTOA, by and through the Board and Henderson Properties, issued a "Notice of Intent to Lien."[42, 43]

53.     On or about May 8, 2020 and well within the time to do so, the Members, once again, disputed the debt pursuant to the FDCPA.[44]

54.     On or about July 28, 2020, FTOA, by and through the Board, contacted the Members, again, threatening litigation if the "Special Roof Assessment" account was not paid—in spite of the debt having been disputed on numerous occasions.[45]

55.     On or about August 10, 2020 and within the shortened window to do so, the Members timely and properly disputed the inarguably, time-barred debt, yet again.[46]

56.     On or about September 1, 2020, FTOA, by and through the Board, sent certified mail to several Members.[47]

57.     On September 23, 2020, FTOA, by and through the Board—*and at considerable expense to the Members*—had the same documentation *hand-delivered.*[48]

---

[41] No response was received.

[42] Almost sixty (60) days after the most recent dispute; containing no documentation validating the debt.

[43] The account number did not match the Member's *only*, five-digit account number.

[44] No response was received.

[45] In the letter, FTOA, by and through the Board, cited the FDCPA at 15 U.S.C. § 1692 but, for reasons unknown, stated that the statute afforded the Members only fifteen (15) days to dispute the debt. Is it possible that given the fact that the Members were routinely able to dispute the debt within thirty (30) days, they thought they'd have a better chance? (Oddly, the letter was also unsigned.)

[46] No response was received.

[47] For reasons unknown, however, most if not all of the documentation inside belonged to someone else (as if in a clever attempt to avoid mail fraud charges).

[48] The FTOA knew the value of sending Sheriff deputies to Members' homes; especially Members deemed "troublemakers," "infidels" or, "enemy combatants." (Apparently, Members who tried to avail themselves of protections afforded to them by federal law were criminals; and, deserved to be treated as such.)

14

58. On or about October 5, 2020, Henderson's Bethany Totherow proffered what appeared to be a validation of debt which read, in relevant part, *"By my signature, this has been verified as a true and correct statement of account as of October 5, 2020."*[49]

59. When confronted about the *non*-signature, Ms. Totherow's response was first tortured; then delayed; and, then appeared to have to be drafted by someone else (at whose expense, unknown).

60. On October 27, 2020—*one month before the Annual Meeting*—FTOA, by and through the Board, made good on the threats and filed legal action to collect on the *time-barred* debts.[50]

<u>CAUSES OF ACTION</u>

61. The following is a non-exhaustive list of the plaintiffs' causes of action:

    a.) Breach of contract;[51]

    b.) Breach of implied contract of good-faith and fair dealing;

    c.) Breach of fiduciary duty;

    d.) Failure to convey peaceful and quiet enjoyment of the premises;

    e.) Unfair and Deceptive Practices (S.C. Code Ann. § 39-5-10, *et seq*.);

    f.) Fraud;

    g.) Attempted fraud;

    h.) Conspiracy to commit fraud;

---

[49] For reasons unknown, however, her actual signature was missing from the document. In its place, her name in a *computer-generated* font that differed from the rest. (It remains unclear whether this validation was in response to the first, second, third, fourth, fifth or sixth "dispute.")

[50] According to a spokesperson for at least one of the *Slafka* plaintiffs, the use of Association monies to pursue the collection of time-barred debts *could* be construed to be a misappropriation of funds.

[51] To be clear, this is not one (1) count of breach of contract but rather several, <u>on-going</u> breaches. As described more fully herein, plaintiffs allege multiple breaches of contract. Plaintiffs allege that the Association has been in breach of contract since 2012. In fact, the Association is still in breach as of the date of this filing.

i.) Computer Fraud and Abuse Act ("CFAA");[52]

j.) Defamation;

k.) Intentional infliction of emotional distress ("IIED");

l.) Loss of cherished, basic human rights;

m.) Loss of cherished rights guaranteed by the Covenants;

n.) Loss of cherished rights guaranteed by the Rules and Bylaws;

o.) Loss of a cherished pet;[53]

p.) Failure to Maintain; removal of dead, dying or uncontrollable shrubs;

q.) Failure to Maintain; regular roof maintenance and/or leak repair;

r.) Failure to Maintain; lawn and landscaping (mulch, weeding, pruning);

s.) Failure to Maintain; exterior (windows, doors, siding, trim, shutters);

t.) Filing false police report(s);

u.) Failing or abjectly refusing to retract false police report(s);

v.) Unjust enrichment;

w.) Improper use of the United States Mail;

x.) Assault;[54]

y.) Stalking; and,

z.) Abusive debt collection practices and "reporting" as defined by the:

> Fair Debt Collection Practices Act ("FDCPA"); and,
>
> Fair Credit Reporting Act ("FCRA").[55]

---

[52] 18 USC § 1030. (Fraud and related activity in connection with computers; ubiquitously referred to as the CFAA—Computer Fraud and Abuse Act.)

[53] Failure or abject refusal to give notice of chemical usage.

[54] Including, but not limited to, one (1) or more Board members referring to either or, both plaintiffs as, "that faggot." (U.S. law does not specifically define "hate speech" nor is the use of such language, absent intent and what the Court refers to as "fighting words," actionable. "Hate speech" however, is defined, generally, as: "speech that is intended to offend, insult or intimidate an individual based on a trait or attribute, such as sexual orientation.")

[55] 15 U.S.C. § 1692, *et seq.*, and, 15 U.S.C. § 1681, *et seq.,* respectively.

16

## FACTUAL ALLEGATIONS

62.     Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—breached the contracts between the parties.

63.     Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—breached their fiduciary duty.

64.     Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—acted in bad faith.

65.     Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, that the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—at all times relevant, failed or, abjectly refused to act in good faith.

66.     Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—failed to convey the peaceful and quiet enjoyment of the premises.

67.     Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—violated North and South Carolina's Unfair and Deceptive Practices laws.

68.     Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—were unjustly enriched.

69.     Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—violated the CFAA—Computer Fraud and Abuse Act, codified at: 18 U.S.C. § 1030.

70.     Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—violated the FDCPA—Fair Debt Collection Practices Act, codified at: 15 U.S.C. § 1692.

71.     Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—violated the FCRA—Fair Credit Reporting Act, codified at: 15 U.S.C. § 1681.

72.     Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—violated the plaintiffs' free speech.

73.     Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—defamed the plaintiff by filing a false police report; and further defamed the plaintiff by refusing to retract the report.

74.     Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—perpetrated a fraud.

75.     Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—attempted to perpetrate a fraud.

18

76. Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—conspired to perpetrate a fraud.

77. Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—engaged in conduct <u>designed</u> to inflict emotional distress and mental anguish.

77. Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—verbally assaulted the plaintiff *via* "hate speech" used to insult, offend and/or, intimidate.

78. Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—abused their position of authority / acted in excess of official authority.

79. Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—used the United States mails for a purpose(s) other than which it is intended.

80. Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—stalked or, illegally followed (surveilled) one or both plaintiffs and/or, illegally caused them to be followed (surveilled).

81. Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—tampered with elections (ballot harvesting).

82. Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—caused the loss of a cherished pet by failing or refusing to warn of chemical use in and around the landscaping.

83. Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—failed to maintain the property by failing to repair a roof leak.

84. Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—failed to maintain the property by failing to perform yearly maintenance and/or inspections.

85. Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—failed to maintain the property by failing to remove the wrong (full-sized; not "dwarf" variety) shrubs planted in front of the townhome.

86. Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—failed to maintain the property by failing to trim the shrubs after refusing to replace them with the correct shrubs, in 2013, when the matter was first brought to Association's attention; creating a safety and security issue.

87. Plaintiffs allege and therefor aver that, subject to a reasonable investigation or discovery, the defendants deliberately; knowingly; and, with malice aforethought—and, as a direct and proximate result of their bad acts—failed to maintain the property by failing to paint the shutters even after acknowledging that the shutters needed to be painted.

88. As set forth above, the plaintiffs are entitled to money damages.

89.     As set forth above, the plaintiffs are entitled to punitive damages; the unlawful acts described above—including, but not limited to, abusive debt collection practices prior to the false representation of the legal status of the debt in a court of law—perpetrated with spite, malice, ill will, recklessness, wantonness, the willful disregard of the plaintiffs' rights and other circumstances tending to aggravate the injury.

90.     <u>The defendants acted in concert</u>.  As such, "[T]he liability of the individual conspirators continues on from the time they joined the plot until it ends." *United States v. Hodge*, 594 F.3d 614, 619 (8th Cir. 2010).  See also: *Smith v. United States*, 133 U.S. 714, 721 (2013) (emphasis in original) ("[A] defendant's membership in the conspiracy, and his responsibility for its acts, endures even if he is entirely *inactive* after joining it."); *United States v. Bostick*, 791 F.3d 127, 143 (D.C. Cir. 2015); *United States v. Ngige*, 780 F.3d 497, 503 (1st Cir. 2015).  "An individual who claims to have withdrawn must show either that he took some action … or that he disclosed the scheme to authorities." *United States v. Bostick*, 791 F.3d at 143; *United States v. Ortega*, 750 F.3d 1020, 1024 (8th Cir. 2014) ("To establish withdrawal from a conspiracy the defendant has the burden to demonstrate that he took affirmative action by making a clean breast to the authorities …"); *United States v. Morgan*, 748 F.3d 1024, 1037 (10th Cir. 2014).  "The burden that he has withdrawn rests with the defendant." *Smith v. United States*, 133 S. Ct. (2013).  "Having joined forces to achieve collectively more evil than he could accomplish alone, Smith tied his fate to that of the group.  His individual change of heart (assuming it occurred) could not put the conspiracy genie back in the bottle.  We punish him for the havoc wreaked by the unlawful scheme, whether or not he remained actively involved." (Smith v. United States, No.: 11-8976 (Jan. 9, 2013)).

91.     Allegations and averments in this Complaint pled with specificity so as to satisfy Rule 8's low bar while at the same time preserving what the plaintiffs believe to be evidence that may be part of a state, criminal investigation—*if any*—under allegations of violations of South Carolina's Omnibus Adult Protection Act, codified at: S.C. Code Ann. § 43-35-5.

92.     In light of the forgoing, the plaintiffs are entitled to actual, presumed, punitive and other damages in an amount to be specifically determined at trial.

21

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court enter an award and judgment in their favor, and against the defendants, jointly and severally, for actual, compensatory, statutory, presumed, other and punitive damages, as determined by a jury; plus, fees, costs, pre- and post-judgment interest at the legal rate, attorney's fees, reasonable expert witness fees; and, any and all other such relief as this honorable Court deems just, equitable and proper, as follows:

(a) compensatory damages of not less than $28,500,000.00;

(b) punitive damages of not less than $28,500,000.00; and,

(c) such other and further relief as the Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38(b), Plaintiffs demand a trial by jury on all claims so triable.

Date: May 6, 2021

Michael Slafka, *pro se*
213 Sigel Drive
Fort Mill, SC 29715-6550
(803) 659-4003
(803) 999-3730 (fax)
michaelslafka@gmail.com

Date: May 6, 2021

David Carr, *pro se*
213 Sigel Drive
Fort Mill, SC 29715-6550
(803) 389-8780
(803) 999-3730 (fax)
thecarrguy@hotmail.com

22

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiffs respectfully request that the Court enter an award and judgment in their favor, and against the defendants, jointly and severally, for actual, compensatory, statutory, presumed, other and punitive damages, as determined by a jury; plus, fees, costs, pre- and post-judgment interest at the legal rate, attorney's fees, reasonable expert witness fees; and, any and all other such relief as this honorable Court deems just, equitable and proper, as follows:

      (a) compensatory damages of not less than $28,500,000.00;

      (b) punitive damages of not less than $28,500,000.00; and,

      (c) such other and further relief as the Court deems appropriate.

<u>JURY DEMAND</u>

Pursuant to Rule 38(b), Plaintiffs demand a trial by jury on all claims so triable.

Date: May 10, 2021

Michael Slafka, *pro se*
213 Sigel Drive
Fort Mill, SC 29715-6550
(803) 659-4003
(803) 999-3730 (fax)
michaelslafka@gmail.com

Date: May ___, 2021

David Carr, *pro se*
213 Sigel Drive
Fort Mill, SC 29715-6550
(803) 389-8780
(803) 999-3730 (fax)
thecarrguy@hotmail.com

22